899 So.2d 251 (2003)
STATE DEPARTMENT OF HUMAN RESOURCES
v.
R.E.C., Sr., and A.T.C.
2010672.
Court of Civil Appeals of Alabama.
July 25, 2003.
Order Dismissing Rehearing September 12, 2003.
William H. Pryor, Jr., atty. gen., and J. Coleman Campbell, deputy atty. gen., and *253 Lynn S. Merrill, asst. atty. gen., Department of Human Resources.
William J. Paul, Geneva, for appellees.
*252 MURDOCK, Judge.
This is an appeal by the State Department of Human Resources ("DHR") from a judgment of the Geneva Juvenile Court in a dependency proceeding, see Ala.Code 1975, § 12-15-1 et seq., returning R.C., S.C., A.C., and B.C., four minor children, to the custody of their parents, A.T.C. ("the mother") and R.E.C., Sr. ("the father"). We reverse.
The record reveals the following facts.[1] DHR's first involvement with this family occurred in April 1999 when DHR received a report of inadequate hygiene. The report was investigated and later marked "not indicated." In June 2001, however, DHR investigated a second report of inadequate hygiene and deficient living conditions. DHR's investigation in response to this second report revealed dog feces on the floor of the wood-frame home in which the children were living and that the family was bathing with water from the back of the toilet. The children smelled of urine and had head lice. Consequently, DHR instituted a safety plan to improve the children's living conditions and their personal hygiene.
When the DHR caseworker, Jennifer Harrison, and another DHR social worker, Jimmy King, returned to the parents' home on August 7, 2001, they found that the safety plan had not been followed. The father, who was unemployed, was at home with two of the children, B.C. and A.C.; the mother reportedly was at work at a local fast-food restaurant. B.C., a two-year-old, was wearing a diaper so full of urine and feces that it was sagging to his knees. Both B.C. and A.C. were dirty and had not been bathed in several days. The home was in dire need of repair. One side of the porch had collapsed and the other side was covered with junk.[2] The family's dog appeared to have the mange and bleeding sores.[3]
Harrison and King left the parents' home and went to visit the two older children, S.C. and R.C., at school. They were informed by the principal that the children had hygiene problems. Harrison reported that she and King "observed the [older] children and they were still infected with head lice and insect bites covered their arms and legs. Each of these children were dressed in dirty, torn clothes and reeked of urine." Also, DHR was advised that the parents were about to be arrested on worthless-check charges.
Based on the foregoing, DHR immediately made a decision to remove the children from the parents' home. The conditions Harrison and others encountered upon returning to the home on the same day to take custody of the children were set forth in a report to the court:

*254 "When we returned to the home, Geneva County Sheriffs Deputy Neal Bradley and Samson Police Chief Jerome Cobb accompanied Jimmy King and myself. During this visit, we were able to look at the inside of the home as the police officers ordered [the father] to restrain his dog. When we walked into the home, it almost took the breath out of us, as the home reeked of ammonia and/or urine. Once we got over the initial shock from the smell, we assessed the rooms. The front room appeared to be a laundry/bedroom as the dirty clothes practically covered the floor. It should be noted that the room was approximately 12 x 12 and had only a trail to walk on. While in this room a dog was comfortably lying on the dirty clothes. It is the workers opinion it appeared that the dog had the mange because it had areas as where the fur had fallen off and sores had developed causing the dog to bleed. After leaving this room, we walked into another room, which appeared to be the living area. This room was also cluttered with dirty laundry and other items, such as paper, bags, and filthy shoes. While walking through the rest of the home the smell of urine and the dog forced each of us to go back to the entrance to get some fresh air. After getting our breath we re-entered the home and went as far back as the bathroom and could not go any further as the smell was very strong and unhealthy. While in the bathroom, the floor appeared to be falling in as the boards looked to be decaying from either a busted pipe or from the roof leaking. While in the bathroom we observed the toilet and sink and they were covered in dirt and feces. . . .
"After placing the two children into a car set in the workers vehicle I spoke with [A.C.] who was old enough to speak and answer questions. Both of the children's hair was also infested with head lice. I asked [A.C.] had she and her brother had lunch today and she stated that they had not had breakfast or lunch, but she had something to drink. I then asked her why she didn't eat and she replied, `my daddy didn't want to give us anything.'
"Once back at the office we observed the children more closely and started treating the head lice with a shampoo recommended for this purpose. All four of the children's hair was heavily infested with lice and smelled. We had to spend several hours combing the live lice and nits out of the children's hair, especially [A.C.] Their scalps were covered in nits and scabs where they had apparently had the lice for a while and had scratched sores on their heads from the lice itching and biting them. We also gave each child a bath separately and they were so filthy, that the water was discolored because of the dirt. The children's clothes smelled of what is believed to be urine and had obviously not been washed in several days. While changing the diaper on the baby, [B.C.], we observed a severe case of diaper rash. This rash appeared to have been several weeks to even a month old as the rash was deep red and had began to spread down his legs."
At the time of the children's removal from the home, R.C. was seven years old; S.C. was 5 years old; A.C., the only female child, was 3 years old; and B.C. was 2 years old. The children were placed in a foster home. On August 8, 2001, the Geneva Juvenile Court adjudicated the children dependent and entered a judgment awarding temporary legal custody to DHR. The parents were allowed supervised visitation with the children.
Just 10 days later, on August 18, 2001, the foster parents reported to DHR that *255 the children had disclosed information causing them to believe that the children had been sexually abused. As a result, DHR suspended visitation between the parents and the children until a "Child Abuse/Neglect" investigation was completed.
After receiving the report from the foster parents, Leslie Henderson, the DHR social worker investigating this case, interviewed all of the children except B.C., who was not verbal enough for an interview. S.C., the five-year-old boy, told Henderson that his parents had touched him in a sexual manner, that the father had put his finger in their private areas, and that the mother had been present when this occurred. S.C. told Henderson that his father had put his "finger in my butt" and also had "put a big brown stick in his private." Henderson reported that S.C.'s foster mother had advised her that S.C. masturbated excessively. S.C. has been diagnosed with attention deficit hyperactivity disorder. Henderson further reported that S.C. wets his bed at night and that his IQ is borderline retarded.
Henderson likewise reported that A.C., who was approximately three years old at the time of her initial interview with Henderson, described to Henderson sexual abuse committed by her parents. Henderson reported that A.C. wets her pants at school, masturbates excessively, and screams and refuses to cooperate in receiving a bath. The foster mother advised Henderson that A.C. explained her reaction to receiving a bath by stating, in the words of the DHR report, "Daddy stuck his private in her butt."
The oldest child, R.C., when interviewed by Henderson, denied that any abuse had occurred and stated that his father had only checked his buttocks area for an infection. As discussed below, at a later date, however, R.C. claimed that the father had touched him in a sexual manner; he later recanted those statements.[4] There is evidence in the record that R.C. also masturbated excessively and that his foster mother had found him playing with the "private area" on the foster family's dog. R.C. also has been diagnosed with attention deficit hyperactivity disorder, and he also wets his bed at night. R.C. repeated the first grade and has been found to have some learning disabilities.
The children were referred by DHR to the Southeast Alabama Child Advocacy Center for forensic evaluations. Joan Head[5] conducted forensic evaluations of S.C. and R.C. In an October 3, 2001, interview by Head, S.C., the five-year-old, stated that he did not want to get his father "in trouble." When asked if there were some things he did not like, S.C. responded that he did not like to take baths.
In an October 10, 2001, interview with Head, S.C. was asked if there was any place on his body that no one was supposed to touch. S.C. pointed to his penis and his buttocks. Head then asked if anyone had touched S.C. in those places, to which S.C. gave a negative response. However, Head subsequently discussed with S.C. three types of touches: "good touches that make you feel good and happy inside"; "bad touches that hurt, like a pinch or a hit"; and "secret touches, when someone bigger or older than you touches you in a way that makes you feel yucky and tries to keep it a secret." After discussing *256 some good and bad touches, when asked to name a secret touch, S.C. replied "Dad stuck his fingers in my butt." S.C. told Head that this happened in the living room and that individuals named "[D.]" and "[A.]" were there. S.C. stated that no one else put anything in his "butt," but in the same interview he said "Dad put a stick in my butt" and that it had "branches." S.C. further stated that "Dad put his bad area in [A.C.]'s butt" and that this happened a lot. S.C. stated that the father did not put his "bad area" in S.C.'s "butt" but that the father stuck his fingers in S.C.'s "butt a lot." Head's report states that S.C. disclosed the foregoing information in a very quiet voice, while keeping his head down and avoiding eye contact most of the time.
Referencing an October 17, 2001, interview, Head reported that she asked S.C. if he would help her understand some of the information he had provided to her during their previous visit and that S.C. agreed that he would do so. He again avoided eye contact, but, according to Head, was "unhesitating in his disclosure." Head's report states, in part:
"When asked to tell about the stick his father put in his `butt,' S.C. said it was a branch. `He (his father) broke a stick off a branch. He done it twice.' [S.C.] went on to say, `My mom was there and watched him.' [S.C.] also repeated that his father had put his fingers `in my butt.' [S.C.] said, `Mom didn't do nothing' when his father put the stick in his `butt.' [S.C.] said it `hurt.' [S.C.] then spontaneously said his father put `his private area in my butt.' [S.C.] said he did this `a lot.' [S.C.] explained that his father put `jelly on his private' when he put his private in [S.C.]'s `butt.' [S.C.] said jelly came out of his father's penis and `got all over.' [S.C.] said his mother was watching when this happened. [S.C.] said that this has happened to [B.C.], as well as [A.C.] and [R.C.] When asked if anyone else was there, [S.C.] said [D.] and [A.] watched, but did not take part. [S.C.] said his `Grammy and PawPaw' from Pensacola surprised his father one day. [S.C.] said, `They didn't let my dad do it again.' [S.C.] said they didn't tell anybody, but he (his father) stopped."
Head reported that a "Child Sexual Behavior Inventory" was completed by the foster mother. The inventory consists of 36 items that measure the frequency of certain conduct by a child over the previous 6-month period. According to Head's report, a child with no history of sexual abuse will rarely obtain a raw score of more than five. S.C.'s total raw score was 25, and 2 out of 3 test scores derived from this raw score were "clinically significant scores," i.e., "likely related to sexual abuse."
Head reported that S.C. was consistent during his various interviews with his disclosure details. In addition, according to Head's report, both S.C.'s high test scores and his demeanor throughout the evaluation process corroborated the information he provided in interviews with Head.
A different counselor from the Child Advocacy Center, Sherri Shaw,[6] interviewed A.C. A.C. was a four years old at the time of the interview, and is the only female child in the family. In Shaw's report of an October 3, 2001, interview with A.C., Shaw explained that she drew an outline of a "gingerbread girl" and asked *257 A.C. to tell her what was needed to fill in the drawing to make it more like a real girl. After this was done, A.C. was asked to identify the various parts of the body, which A.C. did. Shaw's report then reads as follows:
"After she had named each part, I referred to each named part and asked who had touched each part. She readily answered my questions as she drew a picture. She told me the picture was of me. When we got to the vagina, I asked her who touched her vagina. She began scribbling on the picture of me. She drew lines back and forth until virtually my whole `body' was covered. . . . I asked her why she did that. She stated that she was mad at me. I asked her why she was mad. She told me that it was because I wanted her dad to go to jail just because he likes to play with her vagina. She assured me that her daddy loved her and when she lives with him again, she will make him stop playing with her vagina. I attempted to talk about this some, but she would not.
"She drew a picture of three people. I asked her to tell me about her picture. She identified it as her dad, mom and self. She drew a smiley face on her dad, but drew no mouth at all on her mom or self. I asked her about this. She stated that her dad was smiling because he was looking at vaginas and he really likes them. `They are his best toy. No, butt' maybe the bestest toy, I don't know. I know he likes vagina.' She told me that her mom watched sometimes when her dad put his penis in her butt and vagina.. . .
"She then turned her page over and continued to draw. She drew a small body, a smaller body with a `mean face' and a head with a runny nose because he was crying. Next, she drew a much bigger body that loomed over the others. I asked her to tell me whom the picture represented. She identified herself as the small body. [R.C] had a mean face because he was mad about `a penis hurting [A.C.] and [S.C.]" She identified [S.C.] as the one with the runny nose. She said that his nose was runny because he was trying not to cry. I asked why he wanted to cry. She told me that it was because her dad pushed his penis on [S.C.]'s butt. Finally, she labeled the last one as her father. The father drawing had four lines coming out of the head. The other bodies only had two. On the father drawing, the outside lines were longer. The two inside lines were `connected' by another line. I asked her if she had drawn both arms and legs on her dad. She told me that the middle was his penis and he put it in her `ALL of the, ALL of the time.'"
In an October 10, 2001, interview, Shaw discussed with A.C. the same three types of touches that Head discussed with S.C. Shaw's report of this visit reads as follows:
"We briefly discussed touches. [A.C.] easily was able to demonstrate touches. She spontaneously began talking about her dad's penis `spitting.' I told her that I did not know what she meant. She stated that he takes his clothes off in the living room and squeezes his penis and he makes it spit all over the place. She stated that she did not know how her dad's penis could spit because it doesn't even have a mouth. She assured me that he could make it spit, but when her brothers have to put their penis on her it never spits. We discussed this briefly. She told me that one time her dad's penis was spitting so much that her mom had to tell him to stop and don't spit on her anymore. She stated that he didn't spit on her anymore, but she thinks he spit in her vagina and butt. I asked why she thought that. She stated that it got wet on her vagina *258 and back when he pushed his penis on her."[7]
Shaw's report from an October 17, 2001, interview with A.C. includes the following:
"We reviewed [A.C.]'s responses from our sessions. We reviewed truth and lie. Finally, I asked if everything she had stated was the truth. She indicated that it was. I asked [A.C.] many questions posed in a variety of different ways. On each occasion, she was consistent with her previous disclosure. I even misquoted her. She quickly and accurately corrected each statement I made.
"I asked her if anyone else had ever touched her vagina or made her touch their penis. She stated that [W.R.][8] peed on her sometimes. [R.C.] and [S.C.] had to put their penis on her vagina, but her dad put his on her `LOTS of LOTS of times, but it is okay. He can get medicine and then he will stop.' I asked her who [W.R.] is. She stated that it is a friend of her dad's. She did not know his last name. She told me that most of the time her dad put his penis on her when she was in her bed. She stated that he has been doing this since she was a little girl, only three. She told me that [R.C.] cries when he has to push his penis on her because he doesn't want to do it. She told me that her mom never put a vagina on her. She then said that [W.R.] and daddy both like to put their penis in her mom. She told me that her mom likes it better when [W.R.] and daddy put their penis on her because they do it good. [R.C.] and [S.C.] don't do their penis good in her. She told me that her mom and dad are always trying to show [R.C.] and [S.C.] how to do it right, but they aren't learning very well. Finally, she told me that [W.R.] and her dad both put their penis in [R.C.] and [S.C.]"
Shaw also reported that A.C.'s total raw score on the Child Sexual Behavior Inventory was a 31. Like S.C.'s scores, A.C.'s derivative scores were clinically significant and "likely to be related to sexual abuse." She reported that A.C. was consistent with her disclosures that her father and brothers, as well as a man named W.R., have had sexual contact with her. Shaw reported that A.C. "could consistently provide details surrounding the alleged abuse."
In a report to DHR dated October 26, 2001, Shaw stated "[A.C.] is very consistent and has a great deal of sexual knowledge. I believe this child will tell more as time goes on. Right now, she is very worried about her mom and dad getting in trouble."
The record also contains reports by Head of interviews she conducted with R.C. She reports that, during an October 10, 2001, visit, she asked if anyone had ever put anything in R.C.'s "butt," in response to which "[R.C.] got very angry and said `if anyone said that happened they are a frigging liar; they are a stinking liar.'" The following page of Head's report *259 (which, if it followed the same format as Head's interview with S.C., would contain a discussion of additional interviews with R.C.) is missing from the record on appeal. Head's report, however, does contain the following:
"The Achenbach Child Behavior Checklist (CBCL) was completed by [the foster mother] in order to obtain her perceptions of [R.C.]'s behaviors. [R.C.]'s Total Problems score was in the clinical range. This result indicates that [R.C.]'s foster mother reported more problems than are typically reported by parents of boys aged 6 to 11, particularly withdrawn behavior, thought problems, attention problems, and rule breaking behavior.
"The Child Sexual Behavior Inventory (CSBI) was completed by [the foster mother]. It is a 36-item measure that rates the frequency of certain behaviors over the previous six-month period. A child with no history of sexual abuse will rarely obtain a score of more than 5. [R.C.]'s total raw score was 29. Based on his foster mother's responses, [R.C.] received a Total T-Score of 110, his Developmentally Related Sexual Behaviors (DRSB) T-score was 65, and his Sexual Abuse Specific Items (SASI) T-score was [greater than] 110. These results mean that [R.C.] received clinically significant scores on all three scales. High SASI scores, in particular, are likely to be related to sexual abuse.
"The above assessment instruments are intended for use in conjunction with other methods of assessment for child sexual abuse, including interviews and observations.
"Summary and Recommendations:

"[R.C.] is a 7-year-old white male who was referred to the Southeast Alabama Child Advocacy Center by Ms. Leslie Henderson, Geneva County Department of Human Resources. He was referred for a Forensic Evaluation due to allegations of sexual abuse by his parents, [A.C.] and [R.E.C., Sr.] [R.C.]'s demeanor throughout the evaluation indicated much anger and stress on his part. His speech was often slow and deliberate and seemed as if he were trying to protect both his parents and his younger siblings. He often avoided eye contact and sat upright with his arms crossed across his chest. He appeared stiff, angry, and stressed. He consistently denied any touching troubles, but his demeanor seemed to contradict his denial. Also, at different ages, some sexual behaviors are clearly more common than others. However, [R.C.] received a clinically significant score on the Developmentally Related Sexual Behaviors scale on the CSBI. His high DRSB score may indicate that [R.C.]'s knowledge and behaviors related to sex and sexuality is too great for his age. These DRSB scores are also significantly related to family sexuality, and some of the elevation may reflect a greater exposure than that of the average child to nudity and adult sexuality. [R.C.] also received a clinically significant score on the SASI scale. [R.C.]'s high SASI score is likely related to sexual abuse."
Shaw's report states that the father advised Henderson that he was the product of incestthat the father's parents were his brother and sister. Both Shaw's and Head's reports contain statements that the father told Henderson that he was raised by his grandparents, who were alcoholics and who abused him sexually, physically, and emotionally. The record also supports the finding eventually made by the trial court that the father is "low functioning *260 intellectually."[9]
In a September 4, 2001, report by Harrison to the court, Harrison states that, on August 30, 2001, the foster parents' biological son was in his home and answered the phone when a man identified as [the father] "made very inappropriate and sexually [sic] comments." According to the report, the foster parents also have received other harassing phone calls.
On October 12, 2001, the parents filed a motion for the immediate return of the children. A hearing was conducted on November 9, 2001, as a result of which the juvenile court denied the parents' motion, "find[ing] that probable cause exists that these children may have been molested sexual[ly] by or with the consent or at the direction of the parents."
We note that the record contains a report filed on February 15, 2002, by DHR indicating that the agency plan for this case was to "work with the parents with reunification, but the children are to remain in foster care until further notice. We have also made a secondary plan if the reunification with parents does not work out. The alternative plan is to place the child[ren] with their grandparents as soon as the Interstate Compact forms from Florida ha[ve] returned approved." This same report indicated that the children were no longer in the home of the foster parents, with the notation: "foster parents gave up license."
On February 20, 2002, the court entered an order allowing the mother frequent unsupervised visitation with the children; the father was allowed supervised visitation only. Both the father and the mother were allowed telephone contact with the children.
The juvenile court held an ore tenus hearing on March 13, 2002. Although the Child Advocacy Center ("CAC") reports were admitted into evidence, the only CAC counselor to testify at the March 13 hearing was Head, who testified as to part of the information in the CAC reports. Head explained that the children had knowledge that was much more than one would expect from children their ages and, specifically, that they were much more knowledgeable about sexual body parts and processes than would be expected of children their age. Speaking to the improbability of children of this age being able to describe events and body functions with the degree of consistency and detail that the children in this case did, without actually experiencing the same, Head testified that children of such a young age would not
"have a frame of reference until [sexual abuse] actually happens to them and they have that experience and they have that frame of reference. And then they remember. . . . And they would be aware and they would have this advanced knowledge of sexual acts that they shouldn't [have] at that age."
Head also testified that it was her opinion that, based on her interviews with R.C. and S.C. and from reviewing Shaw's report concerning the interviews with A.C., that the children had been sexually abused. Head also expressed concern for the children's safety if they were returned to their parents' household.[10]
*261 Keith Ellis, a licensed family and marriage therapist[11] who had begun counseling sessions with the family at the time of the March 13, 2002, hearing, testified to his belief that the mother loved the children and would attempt to protect them. The mother also testified at that hearing and stated that she would abide by a safety plan and cooperate with DHR. We also note that after the children were removed from the home, the mother and father secured housing that was in a better condition than the housing in which they lived at the time the children were removed from the home.
The mother also gave her opinion at the March 13, 2002, hearing to the affect that the father would never do anything to harm the children, and she stated that neither she nor the father had any felony, domestic-abuse, or assault-related offenses on their records. The mother further testified that she had no idea why the children would make allegations of sexual abuse.
Following the March 13 hearing, the trial court entered an order on March 18, 2002, requiring DHR to develop a safety plan that would allow the children to be returned to the home of the mother within three weeks. The court ordered that this plan include provisions that the father, though not to be prevented from having contact with the children until counseling was further along or completed, was not to be alone with the children or to stay overnight.[12] DHR correctly notes, however, that there is no evidence that counseling will be effective in assisting the father with his particular problem, or that such counseling is available in Geneva County.
In its March 18 order providing for the children to be returned to the parents, the trial court explained that Keith Ellis, a licensed counselor who was "presently working with the entire family," had testified in person at the hearing to the effect that he had not seen or heard anything in his counseling to indicate that sexual abuse had occurred, or that the children would not be safe with their mother. While the trial court did summarize the testimony of Joan Head at the hearing, it made no mention of the detailed, graphic, and consistent statements made by the children that were included in the above-described written reports by Head and Shaw.[13]
*262 On April 11, 2002, in response to the trial court's March 18 order, DHR filed a motion requesting an immediate stay of that order, and a motion to alter, amend, or vacate that order, or, in the alternative, for a new trial. DHR asserted that under Ala.Code 1975, § 12-15-65(m)(1), reunification efforts are not required if a child has been subjected to aggravated circumstances, including sexual abuse. See note 10, supra. DHR asserted that, after reevaluating its case plan, it had determined that the children could not be returned safely to their home, and no workable safety plan could be provided to the court.
DHR's motion to alter, amend, or vacate also asserted that counseling between the children and Ellis had only recently begun as of the time of the hearing and that Ellis, himself, had stated that additional counseling would be necessary to allow the children time to "open up." DHR's motion correctly notes that, nonetheless, Ellis's report of March 29, 2002, indicated sexual knowledge by R.C. beyond his age level. We also note that Ellis's report indicates that the mother told Ellis that the children had been removed simply "because of where we live" and that the mother "seems to minimize or deny the depth of the family problems." In his notes of February 21, 2002, Ellis noted that the mother "does not display affect. She is protective[,] apologetic on [father's] behalf. She seems unaware... of sexual abuse possibilities."[14]
We note that the record also contains reports and "session notes" from other visits between the mother or the father with Ellis, and some meetings between Ellis and R.C. and S.C. In his "session notes" from a meeting with the mother on February 28, 2002, Ellis writes that the mother reported that her mother (the maternal grandmother) was diagnosed as bipolar. The same session notes indicate that Ellis described to the mother some of the graphic and detailed allegations against the father that had been made by A.C. Ellis writes that "[t]his time [the mother] did question if [W.R.] might have done something to the kid. [Ellis] challenged [the mother] again that her children could not know this kind of information unless they had been exposed to the information somehow. [The mother] did show appropriate emotion this time." The same report contains the following comments by Ellis: "[The mother] didn't know why she couldn't be the breadwinner for the family. She seems to have poor insight into [the father's] lack of a job. [The mother] is concerned about working, all the time she has to take off for appointments and visitation."
In session notes dated March 11, 2002, Ellis wrote: "[Mother] reports that [the father] has a much stronger sex drive than she does and that they engage in sexual activity two, three or more times per week."
As noted above, Ellis indicated in his testimony at the March 13 hearing that he had only begun working with the children and that additional counseling sessions would be necessary in order to allow the children to open up to him. In his "session notes" from a meeting with S.C. on February 12, 2002, Ellis states that S.C. does not want to talk and is very supportive of his father. In Ellis's February 19, 2002, "session notes" he reports that S.C. *263 stated that allegations that "dad hurt us" were not true, but that "[S.C.] still has to trust the therapist. He will not open up until a better therapeutic relationship is built." In his "session notes" of March 1, 2002, Ellis reports that S.C. did not want to talk about sexual abuse and on one occasion did not respond to a question concerning sexual abuse, but merely continued playing with toys. The same "session notes," however, include a statement by Ellis that "[S.C.] said [the first foster mother] made him say the stuff about his dad."[15]
Ellis testified at the March 13, 2002, hearing that R.C. and S.C. were "still very guarded" in their discussions with him. Ellis also testified:
"Based on the Child Advocacy report, I believe that something has happened to these children. I do not know who the perpetrator of acts or exposure to information is. The information that's in the report is not appropriate to the age of the children as reported. I have no reason to doubt the Child Advocacy report as far as something happening."
Ellis also testified that, in order for the children to adequately open up to him, he "would say that the minimum we're looking at is 13 weeks to know where we are in this particular case." Ellis also testified that:
"these children are still resistant to [discussing certain things] because, in my opinion, they believe that whatever was said [in the past to other DHR agents] has caused this problem in their family and they don't want to say anything else to keep them away."
The record also contains "session notes" from meetings between Ellis and R.C. in February 2002 and early March 2002. Specifically, in notes from a February 19, 2002, meeting, Ellis states that "[R.C.] is defensive of his parents and denies any sexual abuse." Ellis said that R.C. blamed the situation on false allegations by the first foster mother. Ellis concluded his notes by stating that "more time is needed to explore [R.C.]'s feeling and [to] gain his trust." In "session notes" from a March 1, 2002, meeting between Ellis and R.C., Ellis notes that R.C. did not want to talk about sexual abuse, but said "`they' were lying about the sexual abuse and that [S.C.] was a liar."
The record reflects no individual counseling sessions between Ellis and A.C. Ellis *264 explained the lack of such sessions by explaining that he does not conduct therapy sessions with preschool children.
The record also contains a March 29, 2002, report from Ellis containing the following:
"Ms. Floyd [the Geneva County DHR director] inquired regarding the statement in the [trial court's March 18, 2002, order] that [this] therapist
"`had not seen or heard anything in his direct counseling over the last four to six weeks to indicate sexual abuse nor has he observed anything to indicate that the children would not be safe with their mother.'
"[This therapist] explained that this was a direct answer to the question `If [the therapist] had never seen or heard about the Child Advocacy Report, had the therapist heard anything that would indicate sexual abuse of the children in the therapist's sessions with the children or the parents.' The therapist also pointed out, as does the court order, that this therapist does have concerns regarding the sexual abuse of the children as per the CAC report. It was also noted that the therapist testified that it was not unusual for children who have been abused to try and protect their parents and to recant their statements."
The same March 29, 2002, report from Ellis states that the children had stated to him that the original foster mother had asked them "over and over if their Dad had put his privates in the children's mouth. Both [R.C.] and [S.C.] stated that [the original foster mother] said she would give them candy when they would tell the truth." This court notes that the allegations of inquiries by the foster mother as to whether the "dad had put his privates in the children's mouth[s]," does not correspond with most of the allegations relayed by the children to Henderson, Harrison, Shaw, and Head.
Moreover, we note that in the penultimate paragraph of Ellis's March 29, 2002, report he states as follows:
"This therapist re-stated that he believes something happened to the ... children[;] their knowledge of sexual behavior was beyond what they would be expected to know. Further this therapist reiterated that it is difficult for the... children to trust anyone and that the court was told it would take at least three months if not more for the children to trust anyone enough to verbalize the abuse. The children just know they have been removed from the home returned and then removed again."
In addition, Head testified at the March 13, 2002, hearing that she did not believe that the children had made their allegations of sexual abuse at the suggestion of the foster parents.
The record also contains "session notes" from four other meetingstwo between Ellis and S.C. and two between Ellis and R.C. In the March 14, 2002, "session notes," Ellis reports that S.C. was "grieving" the loss of his parents and felt responsible for the family's separation. He also reports that S.C. blamed the first foster mother and alleged that she had given him candy if he answered affirmatively to the question whether the father had done "bad things" to him. The report also indicates that S.C. was afraid to talk with Ellis and, specifically, that S.C. was afraid that if he talked with Ellis he couldn't go home. S.C. added that it made "his head nervous" to talk to Ellis "about this stuff."
In "session notes" from a March 14, 2002, meeting with R.C., Ellis reports that R.C. said he liked being at the Children's Home at which he was currently residing, but would rather go home. R.C. accused *265 S.C. and A.C. of lying to their first foster mother regarding the sexual abuse.
In session notes from a March 29, 2002, meeting with R.C., Ellis notes that R.C. does have sexual knowledge beyond his age level. He reported that R.C. had told him that "he had seen some movies/videos with his dad about sex, even one in the middle of the night. When he was asked if the people were naked he said halfway."
The juvenile court denied DHR's motion to alter, amend, or vacate the judgment or, in the alternative, for a new trial, but did not rule on the motion to stay the children's removal from DHR's custody. On April 5, 2002, DHR appealed to this court.[16] This court granted a stay request that accompanied the appeal and ordered the juvenile court to hold an evidentiary hearing and to make a finding as to whether "a parent had subjected the child[ren] to sexual abuse," citing in our order § 12-15-65, Ala.Code 1975.
On May 23, 2002, the juvenile court held an evidentiary hearing. At this hearing, Shaw was the only representative from the CAC to testify. Kenny Lilly, the house parent of the Wiregrass Children's Home, where the children had been living since February 2002, testified that he had not observed any behavior that indicated that the children had been sexually abused. Jennifer Harrison testified that while observing the children, the father, and the mother during recent supervised visitations, she had not witnessed any indication of past abuse and that the children responded to their parents in a loving manner. Harrison also explained that the parents had fully cooperated with DHR.
As previously noted, after initially denying any sexual abuse, R.C. eventually reported that sexual abuse had occurred, although he later recanted such statements. In the May 23 hearing conducted by the trial court, Harrison testified:
"Q. Did you have an interview with [R.C.] back in November of last year?
"A. Yes, sir.
"Q. And what, if anything, did [R.C.] indicate to you?
"A. He told me that he wanted to tell me what had been going on, that he had not been honest to begin with and that he told me that his dad did various things that Ms.he had told [the foster mother and Henderson] and he wanted to tell me what had happened."
*266 In reference to R.C., Henderson testified at the May 23 hearing as follows:
"Q. [After referring the children to the Southeast Alabama Child Advocacy center for forensic evaluations,] [d]id you have any other opportunities to do any other interviews of the children?
"A. Yes. In November after the advocacy center reports had been completed I spoke with Jimmy Hand, the investigator for the district attorney's office, and he wanted to have the children present. So I made arrangements for [S.C.] and [A.C.] to come up and we sat in and we listened as they discussed what had occurred. Their story had not changed from the interviews that I had with them in August.
"And then on November 6th [R.C.] came in, heWhat I was told by the worker was that he was ready to talk about what had happened to him and that he only wanted to talk with Jennifer [Harrison]. That was his case worker and he knew her, he trusted her. So we set up an interview session. It was videoed.
"....
"Q. Were you able to listen to the questions and the answers?
"A. Yes.
"Q. What were the answers that you recall?
"A. [R.C.] told Jennifer that he was ready to talk about what happened, that he was ready to tell the truth about what had happened. And he told her thatHe said that [E.[17]] made him touch his privates, that his daddy had touched his privates, that he had put his mouth on his daddy's privates and his daddy had put his mouth on his privates.
"He also mentioned that his grandfather had also been present when this happened, that he had participated as well."
Shaw testified at the May 23 hearing that A.C. had more sexual knowledge than would be expected of a child her age, and as a result, Shaw concluded that A.C. had been abused sexually. Shaw also stated:
"A. I tend to get the younger children when I do the evaluations and [A.C.] had just turned four years old. And for four year olds, even when they are telling you things like their day at school, when you start getting into detailsAnd one of the things we always do is, I'll start in the middle and say, I forgot what happened right before that. Oh, what was it right after that? And just kind of jump around, how it is. They have a hard time to bebeing consistent with that at that young age. She never varied her statements.
"I also did things like, I would say things likeI don't know. If she had talked about someone else I would use that name and say that they hadNo, no, no, I didn't say that.... So she quickly corrected me every time. She was consistent every time and that's not very common for a four year old....
"Q. As a result of your forensic evaluation of [A.C.] did you form any type of opinion in your evaluation?
"A. Well, the purpose of the forensic evaluation is to determine whether a child is inconsistent with what they say and what they say. Obviously, if I'm not there, I don't know what happened. So, she was consistent and she never wavered off of what she said and she said that her father would sexually abuse her."
Following the hearing, the juvenile court determined that it could not find by a *267 preponderance of the evidence that the parents had sexually molested or knowingly allowed the sexual abuse of their children. The court ordered that the children be returned home to their mother's custody under the DHR-developed safety plan. DHR appeals, arguing that the trial court abused its discretion when it returned R.C., S.C., A.C., and B.C. to the mother's custody.
Initially, we must note that in reviewing this case we are governed by the ore tenus rule. A trial court's judgment is presumed correct when it is based on ore tenus evidence, and its decision will be set aside only if the record reveals that decision to be plainly and palpably wrong. Ex parte State Dep't of Human Res., 834 So.2d 117 (Ala.2002); M.H.J. v. State Dep't of Human Res., 785 So.2d 372 (Ala.Civ. App.2000). Since the trial judge is in the best position to evaluate the demeanor and credibility of the witnesses and to then use those observations to weigh the testimony, a reviewing court is not free to substitute its judgment for that of the trial court. Ex parte Anonymous, 803 So.2d 542, 546 (Ala.2001).
Dependency proceedings in Alabama are governed by the Alabama Juvenile Justice Act. See Ala. Code 1975, § 12-15-1 et seq. That Act, in pertinent part, defines a "dependent child" as a child:
"d. Whose home, by reason of neglect, cruelty, or depravity on the part of the parent, parents, guardian, or other person in whose care the child may be, is an unfit and improper place for the child; or
"....
"f. Who is in a condition or surroundings or is under improper or insufficient guardianship or control as to endanger the morals, health, or general welfare of the child; or
"g. Who has no proper parental care or guardianship; or
"....
"j. Who is physically, mentally, or emotionally abused by the child's parents, guardian, or other custodian or who is without proper parental care and control necessary for the child's well-being because of the faults or habits of the child's parents, guardian, or other custodian or their neglect or refusal, when able to do so, to provide them; or
"k. Whose parents, guardian, or other custodian are unable to discharge their responsibilities to and for the child; or
"....
"m. Who for any other cause is in need of the care and protection of the state; and
"n. In any of the foregoing, is in need of care or supervision."
Ala. Code 1975, § 12-15-10.
This court has held that subsection m. of § 12-15-1(10) gives a juvenile court the authority to determine that a child is dependent under the totality of the circumstances. Martin v. State Dep't of Human Res., 502 So.2d 769 (Ala.Civ.App.1987). Sections 12-15-65 and 12-15-71, Ala.Code 1975, address the authority of a trial court to enter orders of disposition. A trial court order in this regard will not be reversed absent an abuse of discretion. See State Dep't of Human Res. v. A.K., 851 So.2d 1 (Ala.Civ.App.2002).
The trial court noted in its March 18 order that there was no criminal prosecution and no adult eyewitnesses. DHR argues that this does not mean that sexual abuse did not occur, but only that the Geneva district attorney chose not to subject four-, five-, and seven-year-old children to the rigors of a criminal trial and that, consistent with the information provided *268 by the children in this case, all of the adult "eyewitnesses" were either perpetrators or accomplices. We find merit in DHR's argument.
Before turning to our conclusions regarding the record as it relates to the evidence of sexual abuse committed by and known to and tolerated by the parents, we note certain inconsistencies in regard to the adoption of the "safety plan" in this case. First, if as the trial court found in its May 2002 order, it could not find by a preponderance of the evidence that sexual abuse on the part of the father had occurred, there is no basis for the safety plan which it has implemented. Put differently, the trial court's adoption of a safety plan which attempts to shield and protect the children from the father is inconsistent with the father's fundamental rights to the care and custody of his children and with a holding by the trial court that it could not find that the father had sexually molested the children.
Second, if the safety plan is warranted, it is warranted based on the testimony of DHR social workers and the reports of Head and Shaw, as well as many of the impressions of the children's current counselor, Ellis. All of this testimony is recounted in substantial detail previously in this opinion. Without subjecting the reader to a repeat of this information, it should be noted that many of these same sources report that the mother watched and/or was a participant in some of the abuse. Yet, the trial court ordered the implementation of a safety plan (over DHR's objection that no safety plan was workable) that depends on the mother to shield the children from the father and to report any abuse to authorities.
Third, the adoption of a safety plan to shield the children from the father logically must be based on the evidence of abuse committed by or allowed by one or both of the parents. The children were encouraged by counselors to reveal the abuse which led to the implementation of this safety plan. DHR argues that the safety plan is based on the fallacious assumption that the children, who having once revealed abuse and then having been returned to the abuser by the adults who were supposed to protect them, will again in the future reveal abuse to nonfamily members. DHR argues, we think with substantial merit, that by being returned to the abusive environment, the reporting of abuse upon which the success of the safety plan largely depends, will be hindered because the children necessarily must conclude either no one believes their initial allegations of sexual abuse or that such abuse is "acceptable." Moreover, we note that A.C. is only seen by the current therapist in conjunction with her parents and her siblings and there is no evidence in the record that suggests A.C. would be likely to make the necessary disclosures in such a setting.
We now turn to the merits of the trial court's May 31, 2002, order entered after the May 23, 2002, hearing. The trial court concluded its order with the following reasoning:
"The situation in this case is typical and a good example of how difficult child abuse cases can be. For this court to make a definitive finding of sexual abuse it would be forced to do so based almost entirely on the statements of a four-year-old child who may have been manipulated in a foster setting or by some third party. This, combined with the lack of medical evidence or an adult eye-witness may be why the Geneva County District Attorney's Office is not investigating and has not filed any charges.
"All in all, although the Child Advocacy Center presented that the children *269 have been exposed to inappropriate sexual contact, and this court is concerned with these allegations, there is not sufficient evidence in light of all the evidence and testimony to establish that the parents or either parent is in fact a perpetrator. In other words, after considering all the evidence this court can not find by a preponderance of the evidence that the parents have sexually molested, or knowingly allowed the sexual abuse of these children."
(Emphasis added.)
The trial court's order is premised on two comments that we find contrary to the evidence in this case. The first of these comments is that, in order to make a finding of sexual abuse, the trial court would be forced to do so "almost entirely on the statements of a four-year-old child." Secondly, the trial court casts aspersions on the reliability of that four-year-old child's statements by alluding to possible manipulations of the child "in a foster setting."
This court has great respect for the trial court's judgment generally, and in this case. Nonetheless, we have thoroughly and carefully reviewed all of the record in this case and cannot ignore the import of the evidence that is contrary to the trial court's reasoning. Notwithstanding the ore tenus presumption, we are obligated to reverse the trial court in cases where we find the trial court's judgment to be against the great weight of the evidence. See Ex parte Stonebrook Dev., L.L.C., 854 So.2d 584 (Ala.2003).
We first note the degree of graphic detail and the depth of understanding consistently relayed by A.C., including her detailed descriptions of various events and the function of sexual organs. This alone constitutes substantial evidence that A.C.'s statements, as a mere four-year-old without any preexisting frame of reference if she had not actually experienced these matters, were a result of her actual experience, not planted suggestions. Added to this, however, is the fact that A.C. consistently told the same graphic details in an interview with Henderson and in multiple interviews with Shaw. Further, not only did A.C. repeat the details of her experiences consistently in one interview after another, as Shaw explained, Shaw attempted to lead A.C. into making inconsistent statements as to what had occurred and A.C. consistently and adamantly corrected Shaw in those attempts. The suggestion that, somehow, after only 10 days, the foster mother in this case had been able to train this four-year-old girl to tell relative strangers such "stories" is to make a suggestion that strains credulity, especially in light of the other evidence in this record.
Moreover, and directly contrary to the trial court's finding, we must add to all of the foregoing the fact that A.C. is not the only source of evidence of sexual abuse committed or allowed by the parents. In addition to the graphic, detailed, and consistent statements made by A.C., her older brother, S.C., related essentially the same experiences. Like A.C., he did so in exceedingly graphic and detailed terms. Like A.C., he did so consistently, giving the same information to both Henderson and Head in multiple interviews. Thus, not only were S.C.'s reports of sexual abuse consistent within themselves, S.C.'s statements were fully consistent and corroborative of A.C.'s statements.
We also note at this juncture that R.C., for a time, also gave statements to DHR that revealed sexual abuse. Of the four siblings, R.C. was the only one who had the benefit of attending school for any length of time. The record contains evidence that this allowed R.C. to compare life experiences with other children to an extent that his younger siblings had not and, therefore, unlike his younger siblings, *270 he had the opportunity to develop an understanding of how wrong much of what had happened in his home was. The evidence indicates that such differences between R.C. and his younger siblings cannot be ignored in evaluating the fact that R.C. expressed such anger and defensiveness in discussing the matters at issue in this case and that he changed his story from time to time during the course of the dependency proceeding.
Further still, in addition to the detailed, consistent, and graphic nature of the reports from the three children, the conclusion that the parents have committed and/or allowed sexual abuse of the children is supported by the reports of the foster parents to DHR, the testimony of Harrison, and the opinions formed by Henderson, the opinions formed by Head, the opinions formed by Shaw, and even the opinions formed by Ellis. Considering the totality of the evidence in this case, and the unique nature of that evidence, we come to the conclusion that the record does not support the trial court's conclusion that a finding of sexual abuse would be based "almost entirely" on the statements of a four-year-old child who may have been manipulated.[18]
While, as stated, this court has the utmost respect for the trial court, the fact that so much of the evidence in this case was not presented by way of live testimony at the May 23 hearing may be the source of what we conclude is error on the part of the trial court. We note that A.C., the four-year-old referred to in the trial court's May 31, 2002, order, was the only one of the children as to whom there was much testimony at the May 23 hearing. Several witnesses discussed some of the statements A.C. had made; none of the witnesses focused significantly on statements made by the other children. Nor was there any recapitulation at the May 23 hearing of the opinions and reports of Henderson, Head, or Ellis. In this regard, we find the following statement by the trial court in the transcript of the May 23 hearing to be instructive as to the court's reasoning:
"THE COURT: But Ms. Shaw and Ms. Head's testimony was based on reports that came in from the foster parents who are not experts who reported that the children were indicating symptoms of having beenI don't know if they formulated an opinion about it but they said [A.C.] masturbates all of the time and there was inappropriate sexual behavior and that [A.C.]'s made statements to me about."
This statement by the trial court not only reflects the focus of the witnesses at the hearing on the experiences of A.C., but also offers an explanation for the trial court's conclusion that a finding of sexual abuse would be based "almost entirely" on the comments of a child who may have been manipulated by foster parents. Specifically, the court appears to discount the professional reports and opinions of Shaw and Head as being based upon information provided by the foster parents. It appears that the trial court simply overlooked the fact that the reports and opinions of Shaw and Head, as well as those of Henderson and Ellis, were based primarily not on statements by the foster parents, but on interviews with and drawings provided by the children directly to those professionals.
DHR argues, and the evidence in this case is undisputed, that the reality in dealing *271 with sexually abused children is that they often love their parents and seek to protect their relationship with their parents, even when their parents have hurt them. DHR argues that these children, having once told adults of their abuse, and having been separated from their parents as a result, will not report this abuse again. DHR argues that such reporting by the children would be highly unlikely with respect to a therapist who has made it clear to the children that he makes reports to the court and also works with their parents.
DHR argues, and the evidence, common sense, and common experience all tell us that, while it certainly is possible to coach a child to make allegations of sexual abuse, it would be bizarre indeed for children of the ages of A.C., S.C., and R.C., to all have the depth of knowledge of the function of sexual organs and to be able to relate the graphic and detailed incidents which these children have related, and to do so consistently among themselves and repeatedly from one counseling session to another, even with different counselors, without a frame of reference in actual experience.
This court has carefully and thoroughly reviewed the record in this case. In evaluating the evidence in this or in any other case, and in assessing whether a trial court's factual findings are supported by substantial evidence or are contrary to the great weight of the evidence, this court is not required to leave common sense or experience at the courthouse door. Based upon our review of the record, we conclude that the trial court, based on the evidence before it at the time, abused its discretion in returning the children to the parents' home.
The judgment of the trial court is reversed, and this cause is remanded. In so doing, we reiterate that this appeal has arisen from an ongoing dependency proceeding. Accordingly, as would have been true for any dispositional proceeding that may have been conducted by the trial court since its May 31, 2002, order, with respect to such further proceedings as may be conducted by the trial court, nothing in our mandate prevents the parties from introducing or the court from considering evidence of factual developments since the trial court's May 31, 2002, order.
REVERSED AND REMANDED.
THOMPSON and PITTMAN, JJ., concur in the result.
YATES, P.J., and CRAWLEY, J., dissent.
PITTMAN, Judge, concurring in the result.
The juvenile court's March 18, 2002, order states that "[t]his order is temporary and is one step toward the reunification of the family." The main opinion treats that order and the order of May 31, 2002, returning the children to the mother and directing DHR to prepare a safety plan, as ripe for appellate review. Even if no final judgment has been entered in this case, "court policy favors adjudication of cases on their merits." Ex parte Norwood, 615 So.2d 1210, 1212 (Ala.Civ.App.1992). Because I agree with the main opinion's conclusion that the juvenile court's order in this case was against the great weight of the evidence, and because I would treat DHR's appeal in this case, if procedurally improper, as a petition for a writ of mandamus in order "to assure the just, speedy, and inexpensive determination of [this] appellate proceeding on its merits" (Rule 1, Ala. R.App. P.), I concur in the result to reverse.
CRAWLEY, Judge, dissenting.
Although the allegations against the parents in this case are horrendous, I cannot *272 concur with the reversal of the judgment on the basis that the court's findings were plainly and palpably wrong.
Judge Murdock's opinion states that we "cannot ignore the import of the evidence that is contrary to the trial court's reasoning." 899 So.2d at 269. In this most difficult of cases, I cannot ignore the import of the evidence that supports the trial court's reasoning. Therefore, I dissent.
YATES, P.J., concurs.

On Application for Rehearing
MURDOCK, Judge.
The appellees' application for rehearing is dismissed for failure to comply with Rule 40, Ala. R.App. P.
APPLICATION FOR REHEARING DISMISSED.
CRAWLEY, THOMPSON, and PITTMAN, JJ., concur.
YATES, P.J., dissents.
NOTES
[1] The court apologizes in advance to the reader for the graphic nature of much of what follows. It is necessary to repeat here the degree of detail consistently relayed by the very young children in this case in order to demonstrate why we conclude that the overwhelming weight of the evidence is contrary to the trial court's findings.
[2] The father also explained that he paid only $60 per month for rent and that the landlord would not repair the home because of this.
[3] Upon arriving at the parents' home, Harrison blew her vehicle's horn in order to draw the father out of the house since the dog appeared to be a pit bull dog and was tied to the entrance of the home. When the father stepped outside the residence, he warned the social workers that the dog had previously bitten other individuals and had been quarantined after each incident.
[4] Henderson reported in September 2001 that all of the children had by then become afraid that they would get their father in trouble if they continued their reports of sexual abuse.
[5] Head is a therapist with the Child Advocacy Center and has a master's degree in counseling psychology.
[6] Shaw testified that she is a forensic evaluator and a licensed professional counselor, as well as a national board certified counselor. She has a master's degree in counseling psychology and is the clinical coordinator at Southeast Alabama Child Advocacy Center. She has worked in her profession since 1985.
[7] According to Shaw's report, A.C. "was not clear on whether she was penetrated or not." Henderson reported that a medical examination of the children revealed no physical evidence of penetration. This medical examination occurred after Henderson's interviews with the children and approximately two weeks after the children's removal from the parents' home. There was no evidence in the record as to whether penetration of any of the children by an adult male penis would necessarily be detectable in a subsequent medical exam conducted two or more weeks after the penetration.
[8] "W.R." is identified in the record as an adult male who worked with the mother and who lived for approximately three months with the parties in order to help defray the $60 per month rental cost of their house.
[9] The mother attested to the father's low level of "intellectual functioning." At a March 13, 2002, hearing, counsel for the parents stated to the court that it had "become apparent that [the father] has severe mental problems, mental disabilities, and [a] learning disability that makes it difficult for him [to] keep a job even though he is trying."
[10] Although DHR initially outlined certain steps the parents must take in order to regain custody of their children (e.g., counseling, new housing, etc.) and the record contains evidence of compliance with those requirements, DHR subsequently took the position, which it maintains on appeal, that reunification is not appropriate and there is no safe way for the children to be placed back in the parents' home. Pursuant to § 12-1565(m)(1), Ala.Code 1975, "reasonable efforts" to reunify a child with his parents are not required when the parent has "[s]ubjected the child to an aggravated circumstance, including, but not limited to, abandonment, torture, chronic abuse, substance abuse, or sexual abuse."
[11] Ellis testified that he had a degree in social work and had worked in the counseling field for 25 years.
[12] The safety plan eventually drafted by DHR on March 26, 2002, stated, among other things, the following:

"[The father] will reside out of the home and will have supervised contact with the children. . . . [The father] . . . will leave the home before 8:00 p.m. . . . [The mother] will transport [the father] to his temporary residence....
"[The mother] will not leave the children alone with their father to go outside, to the grocery store, or to work. She will make sure that the children are with her, at school, at daycare, with another family member, or DHR worker. [The father] is not to bathe or dress the children. [The father] is in no circumstance to be alone with the children."
[13] The court did note, however, that Ellis testified that it "was not unusual for abused children to try to protect their parents or care givers, even when abuse is ongoing," a factor which is consistent with the reports by DHR, Head, and Shaw as described above of the children's reluctance to continue their revelations of sexual abuse for fear of causing their parents to be "in trouble."
[14] This same report by Ellis notes that the mother explained to Ellis that W.R. had in fact lived in the house with the family, and that he was someone who had worked with the mother at the fast-food restaurant where she worked.
[15] At the March 13, 2002, hearing, counsel for the parents conceded that Ellis would testify that he had not had enough time to make a complete evaluation and that this "means [the children] haven't opened up completely." Further, despite the fact that the reports and testimony by Henderson, Harrison, Shaw, and Head, as well as Ellis in his March 29, 2002, report, all are to the effect that the children have been sexually abused, and despite the fact that the reports and opinions of the latter three experts are not based merely on the reports of the foster parents, but are primarily based upon the information provided directly by the children in multiple interviews, we find the following colloquy in the transcript of the March 13, 2002, hearing:

"THE COURT: What's the position of [DHR] now?
"[DHR REPRESENTATIVE]: To correct a couple of things [the parents' counsel] says, after spending time with the foster parents and commenting on the sexual abuse, I call to the court's attention that it was less than three weeks after the children that [sic] had came in had [sic] been to counseling, started
"THE COURT: But it did come from the foster parents?
"[DHR REPRESENTATIVE]: I think the foster parents called DHR who set up the counseling.
"THE COURT: The foster parents reported that the children have told them these things?
"[DHR REPRESENTATIVE]: Yes sir...."
[16] We acknowledge the statement in the trial court's March 18, 2002, order that that order was a "temporary order." Clearly, however, the trial court's March 18 order was not a pendente lite order, nor was it nonappealable by virtue of this statement. Rather, this statement merely reflects the fact that the matter before the trial court was an ongoing dependency proceeding, and that the trial court could and would review the interlocutory disposition of the child provided in that order at such time as the trial court deemed it to be in the child's best interests to make a change in its custodial placement. See generally § 12-15-71(a). The fact that the order was therefore "temporary" or "interlocutory" in the sense that it did not bring closure to the dependency proceeding does not prevent the order from being appealable. See Morgan v. Lauderdale County Dep't of Pensions & Sec., 494 So.2d 649 (Ala.Civ.App.1986); In re Rhodes, 444 So.2d 879 (Ala.Civ.App.1984) (without any discussion of the issue, treating an order that was entered two years into a dependency proceeding and that ordered the child's disposition (foster care) to remain unchanged at that time, but subject to a further review nine months later, as an order from which an appeal would lie); Ex parte D.B.R., 757 So.2d 1193 (Ala.1998). See also T.L.R. v. State, 608 So.2d 767 (Ala.Crim.App.1992). Cf. A.L. v. S.J., 827 So.2d 828, 834-35 (Ala.Civ.App.2002) (holding that "[t]emporary custody awards," as opposed to pendente lite awards, "are generally intended to last until the court is petitioned by one of the parties to modify the [judgment] and constitute final orders from which an appeal may lie to this court. C.G. v. C.G., 594 So.2d 147, 149 (Ala.Civ.App.1991))."
[17] The record contains no further identification of this individual.
[18] Nor does the testimony of Lilly dissuade us from this conclusion. As the record clearly reveals, by the time the children began living in the group home operated by Lilly, they were aware that their continued reporting of their experiences to authorities could place the father in jeopardy and prevent reunification.